## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**HARDY L. RUTH,**
　　　　**Petitioner,**

**v.**　　　　　　　　　　　　　　　　**Case No.  4:07cv108/MMP/MD**

**WENDEL C. WHITEHURST, et al.,**
　　　　**Respondents.**

_____

## <u>REPORT AND RECOMMENDATION</u>

　　　　**Before the court is petitioner's counseled petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, and supporting memorandum.  (Docs. 1, 2). Respondent filed an answer, submitting relevant portions of the state court record. (Doc. 14).  Petitioner has filed a reply memorandum and exhibit.  (Doc. 24).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).   It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.**

## BACKGROUND AND PROCEDURAL HISTORY[1]

Petitioner was charged by amended information filed in the Circuit Court of Leon County, Florida, case number 02-427, with Armed Home Invasion Robbery with a Firearm, Attempted Home Invasion Robbery, and Possession of a Short-Barreled Firearm. (Ex. A, pp. 26-27). A jury trial was held on August 26-28, 2003. At trial, the State presented the following evidence concerning the Attempted Home Invasion Robbery charge. Juan Jaramillo testified that he left his apartment at on Greentree Lane at 1:30 a.m. on November 13, 2002. As he left he noticed three males in the parking lot, all dressed in black and wearing hoods, hanging around his roommate's car. He thought they were trying to break into the car, so after Jaramillo got into his own vehicle, he called his roommate to inform him of that fact. (Ex. C, pp. 41-42). Jaramillo's roommate, Sam Chawla, received Jaramillo's call, looked out the window, saw the three males, and then observed two of the them starting up the steps. The males were wearing dark clothing and hoods. He did not recognize any of them. They knocked on his door. After Chawla didn't answer, they knocked again. Chawla called 911. Two or three minutes later the men left. (*Id.*, pp. 51-53).

The State presented the following evidence concerning the completed Home Invasion Robbery charge. Norman Livingston and Aaron Arnold were roommates at an apartment at the Chateau DeVille Apartments. At approximately 2:00 a.m., Livingston was in the living room of the apartment and Arnold was in his bedroom. Livingston heard a knock at the apartment door. The door was unlocked. Livingston got up to look through the peephole, but before he reached the door two black males carrying guns entered the apartment. The males were wearing black face masks.

---

[1]The facts stated herein are those presented at trial and viewed in the light most favorable to the prosecution. Due process requires a state to prove each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution. *Martin v. State of Alabama*, 730 F.2d 721, 724 (11th Cir. 1984). Although this court is not called on to address directly the sufficiency of the evidence, the evidence presented to the jury plays a part in the court's analysis.

One had a pistol while the other had a sawed-off shotgun.  The male with the pistol had dreadlocks protruding from his mask, was darker skinned, and was wearing gray sweatpants and a navy blue sweatshirt.  The male with the shotgun had a "low haircut," was lighter skinned, and was wearing jeans and a dark sweatshirt.  After the males entered the apartment, they ordered Livingston to get on the floor.  They then asked Livingston if anyone else was in the apartment.  When Livingston responded that his roommate was in the bedroom, the two males ordered Livingston to get Arnold out of the bedroom and bring him to the living room.  After the two roommates were seated in the living room, the males began taking personal belongings from both bedrooms and from the common areas of the apartment and putting them into a black plastic garbage bag.  The male with dreadlocks took Livingston into his bedroom, and the other male took Arnold into Arnold's bedroom.  The male with dreadlocks asked Livingston if he had any money.  Livingston responded that he did not.  When the males were finished, they ordered Livingston and Arnold into the bathroom, then left the apartment.  Two or three minutes later, Livingston and Arnold called the police.  (*Id.*, pp. 67-73).  Aaron Arnold's testimony was consistent with Mr. Livingston's testimony.  (*Id.*, pp. 84-90).

At approximately 2:34 a.m., Cathy Kennedy, an officer with the Tallahassee Police Department, received a general report of a possible robbery on Greentree Lane, which advised her to be on the lookout for a red car.  As a result, she was in the area of the Chateau DeVille Apartments looking for the red car.  Officer Kennedy spoke to citizens who informed her that a car meeting the description had been in the complex and that persons who exited the car put something on their hands like they were going to commit a burglary.  (*Id.*, pp. 107-09).

While driving around the complex Officer Kennedy received a report that a home invasion robbery was occurring in the complex.  The dispatch gave a general description of the suspects – that one person had dreadlocks; that one of them was dressed in a dark blue or black hooded sweatshirt and jeans; that the other was

dressed in a dark blue or black sweatshirt and gray sweatpants; and that they had masks on. Since Kennedy was already in the complex, she radioed dispatch asking for help in finding the apartment where the robbery occurred. (*Id.*, p. 111). While waiting for guidance, Kennedy began driving around the apartment complex in the hope of finding it herself, "hoping that something will pop out and flash and that [she would] see somebody running . . . screaming for help or something like that." (*Id.*).  During that time, approximately 10-15 minutes after receiving the dispatch, Kennedy came upon a black male with a dark blue or black hooded sweatshirt and gray sweatpants walking toward the Chateau DeVille complex.  The male turned out to be petitioner.  Officer Kennedy exited her police car and called out to petitioner, asking if she could talk to him for a second.  Petitioner turned around, came toward Kennedy, and started asking her if she knew where a Marlin Perkins lived in the complex.  As described by Officer Kennedy, "things were not adding up:"

> [M]y first instinct is, I'm old enough to remember Wild Kingdom, so I'm thinking Marlin Perkins, you know, that was my first thought. So I kind of questioned [petitioner] again about Marlin Perkins.  And then I'm thinking, well, why is he asking me if I know where this guy lives in this complex.  So things are not adding up, you  know.  They're not adding up.  And then at that point in time as I start kind of looking at him, I notice that even though I have long-johns on, he's sweating.  So then that was another thing that kind of like, hum.

(*Id.*, p. 112).  Kennedy continued talking to petitioner about Marlin Perkins, while surreptitiously calling for back-up. (*Id.*, p. 113).  She saw one of her squad mates coming toward her and called to him.  She explained her suspicions to the officer and decided to detain petitioner for further investigation.   Kennedy advised petitioner that he was being detained but was not under arrest, then handcuffed him, patted him down, and placed him in the back of her patrol car. (*Id.*, p. 113).  As she patted petitioner down, her suspicion was heightened because petitioner was "sweating so badly that his clothing was wet to the touch." (*Id.*, pp. 113-14).  By this time, dispatch had advised Kennedy where the apartment was located.  Kennedy drove there to make contact with the victims.  A show-up was conducted to see if

Livingston or Arnold could identify petitioner as one of the robbers.   Kennedy testified that the victims stated they "could not be one hundred percent positive" whether or not petitioner was one of the robbers "because they were busy looking at the guns pointed at them."  (*Id.*, pp. 115, 124).  Kennedy transported petitioner to the Leon County Sheriff's Department, where she listened while Investigator Suleski interviewed petitioner.[2]  As a result of information she learned during that interview, Kennedy went back out to the apartment complex.  By that time, the shotgun had been recovered.  By traversing possible paths between the shotgun and the location where Kennedy first encountered petitioner, Officer Kennedy was able to locate the black plastic garbage bag containing the stolen items.  She later recovered one of the masks used during the robbery.

Investigator Suleski testified that he came into contact with petitioner at the Leon County Sheriff's Department at approximately 5:30 a.m., just after completing an interview of one of petitioner's co-defendants Gerald Green.  Suleski immediately read petitioner his *Miranda*[3] rights.  (*Id.*, p. 139).  Petitioner signed the form acknowledging that he understood his *Miranda* rights and was waiving them.  (Ex. D).  Suleski told petitioner that Green had given a statement setting forth his version, and that he (Suleski) was giving petitioner an opportunity to provide his side of the story.  Petitioner gave an oral statement setting forth the details of the operation, including the fact that he and his two co-defendants had gone up to an apartment door at the Greentree Lane apartments with the intention of entering the apartment and robbing whoever was inside once they opened the door; but that after they knocked and no one answered, they got nervous and left.  Petitioner also revealed that he and co-defendant Henry Reason were the ones who had gone into Mr. Arnold

---

[2]Kennedy transported petitioner to the Sheriff's Department after receiving information from another officer via radio that petitioner's co-defendant Gerald Green had confessed and identified petitioner as one of the robbers.  Due to hearsay concerns, Kennedy did not relate this information during her trial testimony.  (Ex. C, pp. 104-06).

[3]In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and Mr. Livingston's apartment and carried out that robbery.  Petitioner later led police to the location of the shotgun.  (Ex. C, pp. 141-58).

The defense moved for judgment of acquittal, which was denied.  The court then inquired as to whether petitioner planned to testify on his own behalf.  Defense counsel Mr. Morris informed the court that the defense planned to call another defense witness first, and would then decide whether to have petitioner testify.  At that point, the court engaged in a colloquy with petitioner to determine whether he understood his right to testify and the ramifications of testifying and calling another defense witness.  After further discussion about that issue, the court engaged in what it called its 3.850 inquiry:

> THE COURT: All right.  Are you so far satisfied with the strategies and performance of your attorney in preparing and presenting this case?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: All right.  I think that takes care of all the questions I want to ask for that.
>
> MR. MORRIS [defense counsel]: Judge, if I can address one issue on the record?
>
> THE COURT: Yes.
>
> MR. MORRIS: Mr. Ruth and I had a bone of contention over the ability for me to suppress certain statements.
>
> And I told Mr. Ruth through my view of the law and the facts of this case, there are two issues that Mr. Ruth sought suppression of.  One was related to Mr. Green's vehicle.  And my response to that is we didn't have standing to object to the search and seizure of property out of his vehicle.
>
> The second was with respect to statements obtained from Mr. Ruth, that my review of the circumstances and the facts did not support a motion to suppress.  And the basis for my decision on that, Judge, was based on – I [have] filed literally hundreds of suppression motions.

In this particular circumstance, I didn't feel that we were dealing with a 15 or 20-hour interrogation, deprival [sic] of food and sleep and things of that nature.

Mr. Ruth was under the impression that he should have been read his *Miranda* warnings immediately. My advice in response was, no, it's only when custodial interrogation is initiated. And there's been no testimony that's been elicited today with respect to statements prior to custodial interrogation and prior to a written waiver of his written *Miranda* warnings.

Consequently, my judgment and review of the law and my advice to Mr. Ruth, to be qu[ite] frank, I refused to file a suppression motion because I didn't' believe it was warranted

I only say that to provide clarity to the record in the event there is an issue down the road. But I have thoroughly reviewed the facts of the case and the applicable law to the circumstances and I've done the very best that I can to explain it to Mr. Ruth, as well as his family.

Obviously issues such as standing are difficult concepts for people who are not practicing law on a daily basis in this field, but I have done my very best to explain it to him.

THE COURT: Was there any basis, in fact, that at the time of the search of Mr. Green's vehicle that Mr. Ruth was in the vehicle?

MR. MORRIS: No, ma'am.

THE COURT: Okay. And any evidence that it belonged to anyone other than Mr. Green?

MR MORRIS: No, ma'am.

THE COURT: And specifically belonged to Mr. Ruth?

MR. MORRIS: No.

THE COURT: Okay. All right. That would appear to be a correct statement of the law and very reasonable not to bring any motion because of a lack of standing. I don't see any standing, either.

As to the statement, Mr. Ruth are you claiming in any way – was your claim or concern about a suppression about your statement having to do with the timing of *Miranda*?

THE DEFENDANT: Well, I – I ain't – I don't care about it no more though.

THE COURT: Okay. I just need you to understand though, because if you're convicted and – if you're convicted, you will be sentenced. And then you may be in jail thinking about, oh, gee, I'm concerned because I think that my lawyer was incompetent or ineffective for not moving to suppress my statements.

So I'm trying to air this now while this is fresh in everybody's mind in this case. Because what happens is these motions come in, sometimes at least two years down the road from a jury trial.

. . . .

So as to your statements generally, on the *Miranda* issue you've indicated – and I would agree with your counsel's statement as a matter of law for record that *Miranda* only applies to in-custodial interrogation.

If they had never questioned you, they would never have to give you *Miranda* rights. Never. Because it's only to get those statements that you have to have been advised of your rights.

So you could be arrested. But if there was never an interrogation or questions, *Miranda* doesn't apply. There has to be two things, in-custody interrogation. They can take a defendant into custody, and if they simply blurt out information, then that's not pursuant to questioning. So, again *Miranda* doesn't apply.

So the only testimony I've heard today is that you were at the station, they gave you *Miranda*, and then the statement was made.

All right. Have you contested with your lawyer, or told your lawyer that the facts are other than that? There was no tape recording, so have you told your lawyer that was not the order of things?

THE DEFENDANT: That wasn't the order of things. It wasn't. I was questioned, then *Miranda* rights was asked or told of me. I was

questioned in the field when they first put me in handcuffs, asked me why I was sweating, where I was headed to, who dropped me off, all that.  That's why I had asked him to do that at first.

THE COURT: Okay.  Well, my understanding is that the statements that were admitted in this trial concern statements made at the station, nothing out in the field, if my memory is serving me correctly.

Before they took those statements, you heard the officer testify that they Mirandized you.  Are you claiming something else?  Have you told your lawyer something else?

THE DEFENDANT: Yes.  I told him something else.  I told him what I just said.  I told him something different than what the officer just said.

THE COURT: Okay.  I'm not sure I understand.  What has your client told you as to about the order of events?

MR. MORRIS: Judge, when Officer Kennedy made contact with my client – and you jump in if I misstate anything.  Okay?  He makes contact, and the questions that are asked of him are essentially under the law citizen contact questions.

Hey, why are you sweating; where have you been; what are you doing here; and those sorts of things.  There aren't any – there's no interrogation that took place.  Officer Kennedy didn't testify to any interrogation taking place.  And in her deposition that I took, there was no indication of that, either.

The questions that asked arguably that were posed to Mr. Ruth, arguably led to them taking him down to the police station.  And why are you sweating, and why are you even here, and the Marlin Perkins issue that Officer Kennedy addressed as being odd.

But there were no questions that were posed about, were you involved in X, Y and Z during this robbery.  And there's been no testimony, either in the deposition or in trial today, about any statements of that nature being made pre-*Miranda*.

Now, whether or not Investigator Suleski Mirandized my client immediately, or after having a series of statements with him prior, I think is, from a strategic standpoint, that's another thing that Mr. Ruth is able to testify to and we're going to discuss that.

The issue that I think that Mr. Ruth presents is he was of the belief that those citizen contact statements, which are all relatively innocuous in nature, and are not inculpatory in nature, would be suppressible. Any my advice to him was they are not.

What I concerned myself more with, to be perfectly honest, was seeing what facts were there to support the confession to Investigator Suleski and to see what I could do to suppress Investigator Suleski's – or the statements made to Investigator Suleski.

A review of the factual circumstances surrounding that, as well as the law applicable, I made my decision that I didn't have a leg to stand on.

And those are issues that are largely going to be resolved based on credibility. And quite frankly, it would have been an issue where Investigator Suleski would have testified, just as he did today, that this was the course of events. And Mr. Ruth may have provided testimony that would have been slightly different.

And my experience tells me that the motion would have been promptly denied, and the Appellate Court would have put a rubber stamp on it.

THE COURT: Okay. Had you taken the deposition of Suleski?

MR. MORRIS: Investigator Suleski, actually I did not. And the reason I did not is if Your Honor recalls, we had a relatively lengthy evidentiary hearing in my effort to obtain bail for my client, and there was a very lengthy discussion on the record during that bail hearing about what had occurred and transpired in terms of those statements.

I had reviewed all of the reports by Investigator Suleski, and I had deposed Officer Kennedy who sat through all of the interrogations of, I believe – she may not have sat through Green's, but I know she sat through Mr. Ruth's, and I made a judgment call that it wasn't necessary.

THE COURT: All right. Okay. . . .

(Ex. C, pp. 177-87).

The defense presented its case, including the testimony of Officer David McCranie and petitioner.   Petitioner testified as follows with respect to his interaction with Officer Kennedy out in the field:

Q [Defense counsel]: You wound up meeting with Officer Kennedy, correct?

A [Petitioner]: Yes, sir.

Q: She put you in handcuffs?

A: Yes, sir.

Q: What did she do with you from there?

A: She went and did a showup.  Well, she asked me a couple of questions, put me in the back seat of the car and did a showup in front of the alleged victims.

And they was asking me a bunch of questions; this, that and the other.  And after the victims came to the window, and they had me step out of the car.  And after, I guess, the victims said they couldn't identify me, they put me back in the car and they went to searching around, across the fence and all around the apartment complex there, the whole area.

And after a long time of that, we finally went back to the Task Force.

Q: Okay.  How long do you figure it was while you sat in the back of the patrol car?

A: I would say about two hours, almost.  About an hour and a half.

Q: And then they took you to the Sheriff's Department?

A: Yes, sir.

(*Id.,* pp. 213-14).

On rebuttal, the State called Gerald Green.  Green testified that on November 12, 2002 he, petitioner and Henry Reason got together and planned to commit a robbery using guns.  They got together late that evening and started driving around.

They first stopped at the apartments on Greentree Lane and got out with the guns, intending to rob one of the apartments. They put on masks which they had made out of shirt sleeves. They went to an apartment door and knocked, but no one answered. Green got an uneasy feeling about it, so they left. Green, petitioner and Reason then drove to the Chateau DeVille Apartments. Green was driving and let petitioner and Reason out of the car to commit the robbery. Petitioner and Reason had their masks and guns. Green drove around to the front of the complex, decided that he did not want to be a part of the robbery, and drove away. (*Id.*, pp. 247-65).

The jury found petitioner guilty of Armed Home Invasion Robbery With a Firearm and Attempted Home Invasion Robbery. (Ex. B, pp. 51-52). He was adjudicated guilty and sentenced on October 9, 2003 to twenty years of incarceration, with a mandatory minimum of ten years for the use of a firearm, to be followed by five years probation. (Doc. 1, p. 7; Doc. 14, Ex. B, pp. 57-64). On March 7, 2005 the Florida First District Court of Appeal ("First DCA") affirmed petitioner's convictions and sentences, without written opinion. *Ruth v. State*, 895 So.2d 1071 (Fla. Dist. Ct. App. 2005) (Table) (copy at Ex. H).

On May 18, 2006 petitioner, through counsel, filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. (Ex. I, pp. 1-38). The trial court denied relief (*id.*, pp. 43-55), and petitioner appealed (*id.*, pp. 56-70 and Ex. J). On February 8, 2007 the First DCA affirmed the denial of relief except as to one issue, a sentencing issue. *Ruth v. State*, 949 So.2d 288 (Fla. Dist. Ct. App. 2007) (copy at Ex. L). The case was reversed on that issue and remanded with directions "for the trial court to conduct an evidentiary hearing or to allow for resentencing where the trial court shall consider appellant's request to be resentenced as a youthful offender." (*Id.*).[4] The mandate issued February 26, 2007. (Ex. M).

---

[4]The First DCA noted that "if appellant is entitled to the requested relief, he is merely entitled to a resentencing in which the trial court is fully informed of its discretion to sentence appellant as a youthful offender; appellant is not necessarily entitled to resentencing as a youthful offender." (Ex. L. p. 5 n.1 (citing *Holmes v. State*, 638 So.2d 986, 987 (Fla. Dist. Ct. App. 1994)).

Petitioner, through counsel, filed the instant federal habeas petition on March 15, 2007.  (Doc. 1).[5]  Respondent concedes that the petition is timely and that the claims raised in the petition are exhausted.  (Doc. 14, pp. 3-5).

## DISCUSSION

### Standard of Review

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

---

[5]Counsel for petitioner clarifies that petitioner "has not, and will not, reargue the sentencing issue, even if his former sentence is reinstated.  Mr. Ruth has received all the relief he would otherwise be entitled to with respect to that issue, i.e., the right to have his request for sentencing under the Act to be considered.  Thus, the issues presented by this Petition are fully exhausted and ripe for this Court's consideration."  (Doc. 1, pp. 7-8).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[6]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

---

[6]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from

Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, --- U.S. --- 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); *Jones*, 469 F.3d 1216 (same). The writ will not

issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

**Petitioner's Grounds for Relief**

Petitioner presents two grounds for relief; both question whether his trial attorney provided him the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution.

A.      Clearly Established Federal Law

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that:  (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   "The purpose of ineffectiveness review is not to grade counsel's performance."  *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Chandler* at 1314.  "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  A court's review is objective, in that the court considers "whether there was any reasonable justification for the attorney's conduct."  *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) (citing *Chandler* at 1315).  Thus, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take."  *Chandler*, at 1315.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding."  466 U.S. at 693, 104 S.Ct. at

2067.  Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*, at 694, 104 S.Ct. at 2068.  Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs.  *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

B.    **Federal Review of State Court Decision**

i.    **Counsel was ineffective for failing to move to suppress petitioner's confession**

This ground for relief concerns the admissibility of petitioner's confession to Investigator Suleski.  Petitioner faults counsel for failing to move to suppress his confession on the grounds that it was the product of an illegal detention and arrest.  Specifically, petitioner contends Officer Kennedy did not have reasonable suspicion to temporarily detain him when she first encountered him, and that even if she had reasonable suspicion, the method and duration of that detention violated *Terry*[7] and amounted to an arrest without probable cause.[8]  Petitioner presented this claim to the state courts in his Rule 3.850 motion.

The Rule 3.850 court, applying the *Strickland* standard, denied relief as follows:

---

[7]*Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

[8]Although in the petition, counsel for petitioner has peppered this ground for relief with references to *Miranda* and "custodial interrogation," petitioner's counsel emphasizes that this ground is based on counsel's failure to move to suppress the confession on Fourth Amendment grounds, not Fifth Amendment or *Miranda* grounds.  (Doc. 24, pp. 13, 16-17).

> Defendant first claims trial counsel was ineffective for failure to move to suppress statements Defendant allegedly made to the police on the night of his arrest. Defendant asserts the statements were the result of an illegal arrest because the police unlawfully detained, handcuffed, and interrogated him prior to reading him his *Miranda* rights. Defendant claims if counsel had filed such a motion, the motion would likely have been granted.
>
> The record conclusively refutes Defendant's claim and demonstrates no deficient performance on the part of counsel. During the trial, defense counsel, Defendant, and the judge discussed these statements at length, and counsel advised the Court that he and Defendant had had a disagreement about whether a motion to suppress the statements should be filed. Counsel stated he did not file a suppression motion because he felt it was unwarranted, after thoroughly reviewing the facts of the case and the applicable law, as Defendant's statements were in response to citizen contact questions rather than custodial interrogation. Counsel cannot be held ineffective for failing to raise a nonmeritorious claim. *Canty v. State*, 715 So.2d 1033, 1034 (Fla. 1st DCA 1998).

(Ex. I, p. 44) (citations to trial transcript omitted). Having concluded that petitioner failed to establish deficient performance, the court opted not to take the next step and consider whether petitioner also failed to satisfy *Strickland*'s second prong, prejudice.

In analyzing this claim, the undersigned is mindful that Officer Kennedy's trial testimony was not the only source of information known to counsel with respect to the suppression issue. Officer Kennedy executed a probable cause affidavit detailing the circumstances of petitioner's detention and arrest. According to the affidavit, on November 13, 2002 Officer Kennedy was on the west side of the Chateau DeVille Apartments when she was notified by dispatch that an armed robbery had just occurred at Chateau DeVille Apartment #15. The robbers were described as three black males, one wearing a red shirt and blue jeans; one wearing a black mask and a dark blue or black hooded sweatshirt and gray sweatpants; and the third wearing a black mask and a dark blue or black hooded sweatshirt and blue jeans. One of the masked suspects had "dreds" sticking out from under his mask. Both masked men were armed with guns. Shortly after receiving the dispatch, and while

she was driving around the complex looking for the location of the robbery, Kennedy observed a black male with "dreds," wearing a dark blue or black hooded sweatshirt and gray sweatpants. This male was petitioner. Kennedy called to petitioner, asking if she could talk to him. Petitioner came over and immediately asked Kennedy if she could help him find a resident, "Marlin Perkins."   Once petitioner got closer, Kennedy noticed that despite the fact it was 40 degrees outside, petitioner was sweating heavily enough that beads of sweat were visible on his forehead.  The combination of these facts made Officer Kennedy suspicious that petitioner had been involved in the robbery.  She then decided to "officially detain" petitioner for purposes of investigation.  (Ex. B, p. 3).

Officer Kennedy handcuffed petitioner and patted him for weapons.  While handling petitioner, Kennedy noticed he was sweating so heavily that his clothes were damp to the touch.  Kennedy asked petitioner why he was sweating, to which petitioner responded that he had just walked a long way.  Kennedy placed petitioner in the back of her patrol car, made contact with the victims and conducted a show-up identification.  The victims stated they thought petitioner looked like one of the masked robbers, but they could not be sure because they had been paying more attention to the guns.  While all of this was occurring, Officer David McCranie had stopped Gerald Green (petitioner's co-defendant) and obtained his confession and the names of his fellow robbers, one of whom was Hardy Ruth.  After obtaining Green's statement, Sergeant Jeff Johnson radioed Officer Kennedy and relayed that Green had named petitioner as one of the other suspects.  Officer Kennedy then took petitioner to the Sheriff's Department where he confessed to Investigator Suleski after being read his *Miranda* rights.  (Ex. B, pp. 3-4).

Officer Kennedy recounted the events again at petitioner's pre-trial bond hearing on April 8, 2003.  Kennedy's testimony related essentially the same facts surrounding petitioner's detention, except she elaborated on her suspicion upon initially encountering petitioner. As Kennedy put it, "There was absolutely no reason whatsoever that any resident of any of those apartment complexes would have to approach me to see if I knew where a resident lived. . . . Just by the simple fact that

he asked me kind of confused me right then.  I mean, radar and antennas started going up just at that."  (Doc. 24, Ex. A, p. 13).  Kennedy also expounded that after she initially detained petitioner, she and the other officers in the area, including McCranie, began "comparing notes" and exchanging information via radio concerning what they were learning as they learned it.  (*Id.*, p. 9-10).

In addition to the foregoing, defense counsel deposed Officer Kennedy.  There appears to be no dispute that Officer Kennedy's deposition testimony presented the same description of events pertaining to petitioner's detention and arrest as the Officer's trial testimony.[9]

Based on all of this information, it was not objectively unreasonable for counsel to conclude that Kennedy's initial encounter with petitioner (stopping and calling out to him) was lawful.  Officer Kennedy did not need reasonable suspicion or probable cause to initiate verbal contact with petitioner.  "[N]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification."  *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (opinion of Stewart J.); *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1878-79 n.16, 20 L.Ed.2d 889 (1968) (recognizing the principle that "not all personal intercourse between policemen and citizens involves 'seizures of persons.'"); *id.*, 392 U.S. at 34, 88 S.Ct. at 1886 ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.") (White J. concurring); *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1507 (11th Cir. 1986) ("A police officer may approach an individual in a public place, identify himself as a law enforcement officer, and, in a non-coercive manner, ask the individual a few questions, without converting the encounter into a seizure.").

Further, it was not objectively unreasonable for counsel to conclude that petitioner's detention (up to the time he was transported to the Sheriff's Department for questioning) did not amount to a full custodial arrest, but was a lawful *Terry* stop

_____

[9]Although the parties have not provided a copy of the deposition transcript, they have not questioned or taken issue with defense counsel's representation to the trial judge that Kennedy's deposition testimony was consistent with her trial testimony.  *See* doc. 14, ex. C, pp. 184-85.

for the purpose of determining whether "criminal activity may be afoot," *Terry*, 392 U.S. at 30, 88 S.Ct. 1868.  The standard for evaluating the constitutionality of an investigatory detention is an objective one:  "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

Under *Terry*, a law enforcement officer may detain a person briefly for an investigation if he or she has "a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000). The "reasonable suspicion" has been described as "some minimal level of objective justification" taken from the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *see also Terry*, 392 U.S. at 21, 88 S.Ct. at 1879 (describing "reasonable suspicion" standard as requiring "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion.").  Here, Officer Kennedy articulated several objective facts which provided her with at least reasonable suspicion that petitioner had been involved in the recent criminal activity at the apartment complex:  the information from citizens that individuals were seen in the area acting like burglars, petitioner's appearance in close temporal and geographic proximity to the armed home invasion robbery, petitioner's fitting the particular description of one of robbers in terms of gender, skin and hair color, hairstyle (dreadlocks) and clothing (dark blue or black hooded sweatshirt and gray sweatpants), petitioner's profuse sweating despite the 40° temperature, and petitioner's unusual response when Kennedy called to him.  Thus, defense counsel could have reasonably believed that these specific facts reasonably warranted Kennedy's decision to detain petitioner for a brief investigation.

Counsel could also have reasonably believed that Officer Kennedy was acting within the lawful bounds marked by *Terry* at the time she gained probable cause (via Green's confession) to transport petitioner to the Sheriff's Department for

questioning.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).  In applying this Supreme Court precedent, the Eleventh Circuit has identified four non-exclusive factors relevant to evaluating the reasonableness of an investigatory stop:  "(1) the law enforcement purposes served by detention; (2) the diligence with which the police pursue the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention." *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) (citing *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000)).

Applying the foregoing principles to this case, a reasonable attorney could conclude that Officer Kennedy's purpose in detaining petitioner was to investigate her suspicion of petitioner's involvement in the robbery.[10]  Counsel also could have reasonably concluded that Officer Kennedy diligently carried out her investigation without undue delay.  While Kennedy was talking to petitioner, she received information from dispatch directing her to the location of the apartment.  She acted diligently to confirm or dispel her suspicion by immediately taking petitioner to the nearby apartment and conducting a show-up.  While the show-up did not confirm Kennedy's suspicion with a positive identification, it certainly did not dispel it, as the victims indicated petitioner looked like one of the robbers.  Kennedy then began

---

[10]Although the subjective intent of the officer is irrelevant to the inquiry, *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that "[s]ubjective intentions play no role in the ordinary, probable-cause Fourth Amendment analysis"), it is worth noting that Officer Kennedy told petitioner he was not under arrest; he was only being detained.  Officer Kennedy's stated intention is a factor that courts, as well as any reasonable attorney, would consider in assessing whether a reasonable person in petitioner's circumstances would conclude that he was under arrest.  *See Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003) ("Ochana had no reason to believe that he was under custodial arrest for any offense.  He was not told that he was under arrest. . . ."); *United States v. Corral-Franco*, 848 F.2d 536, 541 (5th Cir. 1988) (accord); *cf. United States v. Mendenhall*, 446 U.S. 544, 555 n.6, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("We agree with the District Court that the subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant except insofar as that may have been conveyed to the respondent.").

exchanging information with the officers detaining co-defendant Gerald Green. (Doc. 14, Ex. B, pp. 3-4 and Ex. C, pp. 104-06, 199-201; Doc. 24, Ex. 1, pp. 9, 13). This information, and petitioner's responses to it, gradually increased Kennedy's reasonable suspicion, (doc. 24, ex. 1, pp. 3, 13), culminating with her learning that Green confessed and identified petitioner as one of his co-robbers. (Ex. B, pp. 3-4).[11]

As to the third factor, the scope and intrusiveness of the detention, counsel could have reasonably concluded that Officer's Kennedy's method of investigation was designed to lead to a quick and non-intrusive resolution of her reasonable suspicion. Kennedy encountered petitioner while searching for the apartment that had been robbed. Kennedy knew the robbers were armed with guns. Counsel therefore could reasonably conclude that Kennedy had a reasonable fear that petitioner may be armed and dangerous, justifying handcuffing and patting him down for weapons. The cold conditions and the desire to expedite the show-up could reasonably be seen as justifying Kennedy's placing petitioner in the patrol car and transporting him to the apartment for the show-up. As the show-up did not dispel Kennedy's suspicion, it was not unreasonable for her to persist in her effort to either confirm or dispel her suspicion by exchanging information with the officers who had contemporaneously stopped, detained and investigated petitioner's co-defendant. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 542, 105 S.Ct. 3304, 3311 (1985) ("Authorities must be allowed 'to graduate their response to the demands of any particular situation.'") (quoting *United States v. Place*, 462 U.S. 696, 709, n. 10, 103 S.Ct. 2637, 2646 n.10, 77 L.Ed.2d 110 (1983)); *see also United States v. Charley*, 396 F.3d 1074, 1080 & n.4 (9th Cir. 2005) (noting virtual unanimity among the Circuit Courts of Appeals that law enforcement may move a suspect without exceeding the bounds of an investigative detention, when it is a reasonable means of achieving the legitimate goals of detention given the circumstances of the case)

---

[11] The facts that must be considered in resolving this ineffective assistance claim are not limited to those that would be admissible at trial. (Doc. 24, p. 11). Thus, petitioner's argument that "there is no admissible evidence to infer that the [sic] Officer Kennedy knew about Green's statements to Officer McCranie" is not persuasive. (Doc. 24, p. 11). The evidence need not have been admissible for counsel to consider it in determining whether a motion to suppress was warranted.

(citing 4 LaFave, *Search and Seizure*, § 9.2(g) (4th Ed. 2004)); *see also United States v. McGrath*, 89 F.Supp.2d 569 (E.D. Pa. 2000) (holding that *Terry* stop that lasted over an hour, involved handcuffing suspect, placing her in patrol car and conducting a show-up was constitutional); *Dempsey v. Town of Brighton*, 749 F.Supp. 1215, 1225 (W.D. N.Y. 1990) (holding that police were reasonable in transporting armed robbery suspect to bank for show-up during *Terry* stop; "Courts have time and again approved on-the-scene showups, occurring reasonably soon after the crime, as one of the best ways not only to catch the criminal but also to exonerate the innocent."); *United States v. Harty*, 476 F.Supp.2d 17, 23 (D. Mass. 2007) (holding that police were reasonable in transporting *Terry* detainee short distance to conduct a show-up).

Petitioner takes particular issue with Officer Kennedy handcuffing him and placing him in the patrol car, arguing that because the pat-down revealed no weapons Kennedy was not justified in handcuffing petitioner. However, petitioner presumes that that was the exact chronology of events. The record is by no means clear. In her probable cause affidavit Kennedy stated that petitioner "was officially detained, patted for weapons, handcuffed and placed into this officer[']s patrol vehicle." (Ex. B, p. 3). However, at the pre-trial bond hearing Kennedy testified that she "handcuffed [petitioner] and put him in the back seat of [her] car." (Doc. 24, Ex. 1, p. 8). At trial, (and presumably at her deposition), Officer Kennedy testified that she "handcuffed [petitioner], and patted him down for weapons." (Doc. 14, Ex. C, p. 113). Regardless, although petitioner was frisked and no weapons were found, it does not follow that he no longer posed a danger to Officer Kennedy such that the use of handcuffs while transporting him in the back of her patrol car was unreasonably intrusive.

"Fourth Amendment jurisprudence has long recognized that the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). An officer conducting a *Terry* stop may conduct a protective search of the suspect for the purpose of discovering "weapons which

might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26, 88 S.Ct.
1868. In *Terry*, the Supreme Court explained:

> Our evaluation of the proper balance that has to be struck in this type
> of case leads us to conclude that there must be a narrowly drawn
> authority to permit a reasonable search for weapons for the protection
> of the police officer, where he has reason to believe that he is dealing
> with an armed and dangerous individual, regardless of whether he has
> probable cause to arrest the individual for a crime. The officer need not
> be absolutely certain that the individual is armed; the issue is whether
> a reasonably prudent man in the circumstances would be warranted in
> the belief that his safety or that of others was in danger.

*Terry*, 392 U.S. at 27, 88 S.Ct. at 1883 (citations and footnote omitted); *see also*
*United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) ("The Supreme Court
has stated that officers may take reasonable steps to ensure their safety so long as
they possess 'an articulable and objectively reasonable belief that the subject is
potentially dangerous.'"); *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002)
("Once an officer has legitimately stopped an individual, the officer can frisk the
individual so long as 'a reasonably prudent man in the circumstances would be
warranted in the belief that his safety or that of others was in danger.'"); *United
States v. Gibson*, 64 F.3d 617, 623-24 (11th Cir. 1995) (A law enforcement officer,
during the course of an investigatory stop, may conduct a reasonable search for
weapons for the protection of the police officer, where he has reason bo believe that
he is dealing with an armed and dangerous individual); *United States v. Hastamorir*,
881 F.2d 1551, 1556-57 (11th Cir. 1989) (holding that handcuffing of suspect during
*Terry* stop was "reasonable action designed to provide for the safety of the agents"
where agents "reasonably believed that the men presented a potential threat to their
safety").

      As for the length of the detention, the facts available to counsel did not
establish a precise time period. Although it would have been apparent to counsel
that Kennedy first made contact with petitioner at approximately 2:45 a.m., (ex. C,
pp. 121, 126), it was very unclear what time Kennedy received the information of
Green's confession (which provided her probable cause to arrest petitioner and
transport him to the Sheriff's Department for formal questioning). From the facts in

the record before this court, the detention appeared to last anywhere from seventy-five minutes[12] to two hours.[13]  Petitioner testified that he was in the field with Officer Kennedy for "[a]bout an hour and a half."  (Ex. C, p. 214).  Although a detention beyond an hour draws close to the outer limits of a permissible *Terry* stop, it is not *per se* unreasonable.  *Gil*, 204 F.3d at 1350 (seventy-five minutes reasonable).  The length of a lawful investigatory stop is not subject to a bright-line test.  *Id.*  The Supreme Court has emphasized "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes."  *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1536, 84 L.Ed.2d 605 (1985).

Counsel could have reasonably concluded that petitioner was lawfully in detention for a reasonable period to effectuate Kennedy's investigation of her reasonable suspicion.  The investigative detention included several steps, all of them reasonably necessary to ensure Office Kennedy's safety or to confirm or dispel her suspicion:  questioning petitioner, handcuffing him, patting him down, driving him to the scene of the robbery for a show-up, making contact with the victims, conducting the show-up, and sending and receiving various communications to and from the officers investigating Gerald Green.  As Kennedy received information, her suspicions mounted.  These facts, combined with Green's confession identifying petitioner as one of the robbers, provided Kennedy with probable cause to conduct a further seizure by transporting petitioner to the Sheriff's Department for questioning.  It is not surprising or disturbing that these steps would together last seventy-five minutes or two hours.  In either case, counsel could have reasonably concluded that the length of petitioner's detention did not exceed the permissible scope of a *Terry* stop.  *See Michigan v. Summers*, 452 U.S. 692, 700 n.12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) ("If the purpose underlying a *Terry* stop – investigating

---

[12]Investigator Suleski testified that he first saw petitioner at the Sheriff's Office sitting in the back of a patrol car at 4:00 or 4:30 a.m.  (Ex. C, pp. 151, 240).

[13]On cross-examination, Officer Kennedy testified that she was unsure what time she arrived at the Sheriff's Department, but agreed with defense counsel that it could have been 5:00 a.m.  (Ex. C, pp. 124-25).

possible criminal activity – is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* . . .").

In short, the record demonstrates that counsel made an informed tactical decision, based on his professional expertise, to not pursue a motion to suppress. This tactical decision was not objectively unreasonable.  Counsel could have reasonably concluded that petitioner's detention was a necessary and minimally intrusive extension of Officer Kennedy's lawful investigative questioning, and, therefore, that petitioner's confession was not the product of an illegal detention or arrest.  Thus,  this court cannot say that defense counsel was deficient in declining to file a motion to suppress on Fourth Amendment grounds.

The state court's denial of relief on this claim was neither contrary to, nor involved an unreasonable application of the *Strickland* standard.   Therefore, petitioner is not entitled to federal habeas relief.

> ii.   <u>Counsel was ineffective for failing to move to suppress or object to evidence located with petitioner's assistance</u>

Petitioner's second claim is closely related to the first.  Petitioner asserts that counsel was ineffective for failing to move to suppress evidence derived from his confession, namely: Suleski's testimony that petitioner went back to the scene with him and showed him where he threw the gun, as well as certain physical evidence (the shotgun itself, and the stolen property).  Petitioner presented this claim to the state courts in his Rule 3.850 motion.  The Rule 3.850 court, applying the *Strickland* standard, denied relief as follows:

> Defendant next alleges ineffective assistance of counsel for failure to move to suppress or object to evidence of Defendant leading police to the shotgun, the shotgun itself, and the stolen property, which Defendant claims were inadmissible because they were the result of an illegal arrest and unlawfully obtained statements produced by the illegal arrest.  This claim is denied on the same basis as the denial of Ground 1.  For the reasons stated above, neither the arrest nor the obtaining of statements was unlawful.  Defendant fails to support this claim of ineffective assistance of counsel.

(Ex. I, pp. 44-45).

The parties concede, and the undersigned agrees, that there is no analytical distinction between the foregoing ground for relief and this one.  (Doc. 24, p. 16). For the same reasons this court concluded that counsel was not deficient for failing to move to suppress petitioner's confession on Fourth Amendment grounds, the court concludes that counsel was not deficient for failing to move to suppress, on Fourth Amendment grounds, evidence located as a result of petitioner's detention and confession.

The state court's denial of relief on this claim was neither contrary to, nor involved an unreasonable application of the *Strickland* standard.   Therefore, petitioner is not entitled to federal habeas relief.

Accordingly, it is respectfully RECOMMENDED:

That the petition for writ of habeas corpus (doc. 1) challenging the convictions and sentences in *State of Florida v. Hardy L. Ruth*, in the Circuit Court of Leon County, Florida, case number 02-4276, be DENIED and the clerk be directed to close the file.

At Pensacola, Florida this 17th day of July, 2008.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).